IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-CR-00011-LTS |
| | ) | |
| vs. | ) | |
| | ) | |
| FADI YASSINE, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING BRIEF

The United States respectfully submits this sentencing brief concerning issues that will be contested at sentencing.

## TABLE OF CONTENTS

I. **Number of Guns** ................................................................................................ 2

II. **Adjustment for Guns Leaving the United States** .................................... 7

III. **Departure / Variance from Advisory Guideline Range Based on Number of Guns Trafficked** .................................................................... 11

IV. **Downward Departure / Variance from Advisory Guideline Range** .. 12

V. **Conclusion** ............................................................................................... 12

1

## Discussion

### I. Number of Guns

The final presentence report (PSR) finds defendant should be held accountable for 100 firearms based upon his involvement in the first two shipments of guns to Lebanon, totaling 100 firearms (30 and 70 firearms, respectively, in each shipment). (PSR ¶ 44).

Defendant does not contest that there were 100 firearms involved in the first two shipments, rather, defendant claims he should not be held accountable for guns in the second shipment because he was cut out of that transaction, despite attempting to play a part in it. *See* (Docket 17 at 2, ¶ 5).

The government does not object to the proposed scoring, but does note there is evidence to suggest defendant continued to plan with Bassem Herz to make a third shipment of guns to Lebanon in March 2015, and therefore could be held accountable for the 53 guns contained in that shipment. *See* (Docket 18 at 1). This would bring the total to at least 153 firearms.

USSG §2K2.1(b)(1)(D) provides for an 8-level increase to the advisory guideline offense level where "the offense involved" 100-199 firearms.

USSG §1B1.3(a) (Relevant Conduct) provides that the base offense level and guidelines adjustments shall be determined on the basis of information that includes the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

2

  (B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

    (i) within the scope of the jointly undertaken criminal activity,
    (ii) in furtherance of that criminal activity, and
    (iii) reasonably foreseeable in connection with that criminal activity;

  that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

  (2) Solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (a)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; and

  (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) [base offense level] and (a)(2) [specific offense characteristics] above, and all harm that was the object of such acts and omissions

USSG §1B1.3(a).

  Here, defendant was convicted of conspiracy to broker the export of defense articles (firearms and ammunition) and to ship and transport firearms in interstate and foreign commerce without a license. (PSR p. 1). Pursuant to USSG §3D1.2(d), because the offense level is determined under USSG §2K2.1 based largely on a measure of aggregate harm (number of firearms), relevant conduct includes all acts and omissions that were part of the same course of conduct or common scheme as the offense of conviction. *See* USSG §1B13(a)(2). Further, pursuant to §1B1.3(a)((1)(B), because the offense involved "jointly undertaken criminal activity"

3

relevant conduct also includes all acts and omissions of others that were within the scope, in furtherance, and reasonably foreseeable as part of that criminal activity. §1B1.3(a)

Defendant aided, abetted, and counseled Bassem Herz in deciding which guns would sell best in Lebanon, both prior and subsequent to the first gun shipment to Lebanon in 2014. Defendant introduced the Herzes to Bilal Yassine, defendant's cousin and a known firearms dealer, for the purpose of having Bilal buy guns from the first shipment and to continue a gun buying relationship with the Herzes thereafter. (PSR ¶¶ 12-14). Defendant claimed he was not compensated for his role in arranging the first gun sales to Bilal. (PSR ¶ 14). Nonetheless, defendant wanted to continue to engage in the criminal activity with Bassem, at a minimum. (PSR ¶ 16). Bassem had also felt cheated by Ali and Bilal, believing Bilal was allowed to pay too little for the guns. Defendant told Bassem what guns would sell best prior to the second shipment in 2014 and fully expected he would receive a share of the proceeds from Bilal for the second shipment. *Id.* While defendant admits he gave $30,000 to Ali Al Herz from Bilal for guns acquired by Bilal from the second shipment, defendant claims he received no compensation for helping Bilal arrange to buy guns from the Herzes. (PSR ¶¶ 18, 19). After the second shipment in 2014, Bassem continued to buy guns in the United States for shipment to Lebanon. (PSR ¶ 25). Bassem remained in contact with defendant and told defendant he was continuing to gather guns. *Id.* Bassem became more upset with Ali when he learned Ali had received money from Bilal and another gun buyer

4

in Lebanon. During this time, Bassem remained in touch with defendant, who was also upset with Bilal. Bassem and Sarah eventually decided to break from Ali and Adam and send their own gun shipment to Lebanon in March 2014. Bassem and Sarah planned to travel to Lebanon after shipping the guns from the United States as had been the method of operation on the prior transactions. Near the time that the March 2015 gun shipment was to be sent, defendant communicated via Facebook with Bassem and told him he mistakenly believed Bassem had already arrived in Lebanon. (PSR ¶ 26; Exhibit 3 at 1931, 1934). This shows defendant was aware Bassem would be coming to Lebanon about that time. Defendant and Bassem also communicated via secure social media applications, yet the content of those communications could not be retrieved as part of the investigation. However, based upon the context of the limited communications that were able to be retrieved, and the entire course of dealing between defendant and the Herzes, it appears obvious that by mid to late 2014, defendant and Bassem had aligned and wanted to work together to sell guns in Lebanon, having felt cheated from their associations with Bilal and Ali. (PSR ¶ 27). Bassem and Sarah needed a contact in Lebanon to help sell the guns and defendant could provide that service.

At a minimum, defendant helped advise as to which guns were best to sell in Lebanon as part of the first two shipments. He acknowledges his participation in introducing Bilal to the Herzes to engage in gun transactions. His association with with Bilal continued through the second transaction for which he hoped/expected to be compensated. The first two transactions totaled 100 firearms, conservatively.

5

The firearms involved in those transactions were part of jointly undertaken criminal actively in which defendant was involved. Defendant knew Bilal was a gun dealer and knew the Herzes were bringing guns into the country to be illegally sold there. (PSR ¶¶ 8, 12, 35). Defendant gave advice as to which guns would sell best in Lebanon and thereby counseled the criminal activity. (PSR ¶ ¶ 7, 16). However, because this conduct involved offenses that would "group" the government need only show the relevant facts "were part of the same course of conduct or common scheme or plan as the offense of conviction," which they clearly were. USSG §1B1.3.(a)(2). Defendant is thus accountable for at least 100 firearms. *See United States v. Sacus,* 784 F.3d 1214, 1219-20 (8th Cir. 2015) (holding defendant accountable for guns he did not personally possess but that were part of foreseeable acts of others in furtherance of jointly undertaken criminal activity per §1B1.3(a)(1)(B); there need not be an explicit agreement as to scope of the criminal activity but the scope may be inferred from conduct of defendant and others; it was significant fact that the defendant provided access to the gun buyer while a co-defendant provided access to the guns); *United States v. Vega,* 720 F.3d 1002, 1003-04 (8th Cir. 2013) (holding defendant accountable for guns defendant did not personally possess but jointly possessed as part of criminal activity with others).

Although defendant claims he never profited from the transactions he helped arranged he nonetheless conspired to commit various gun offenses. Even after he became upset about not profiting from the first transaction, defendant and Bassem forged a stronger relationship that involved plans to buy more guns in the United

6

States for shipment to Lebanon. Defendant told Bassem he was "at your service" (Exhibit 3 at 1923), and Bassem told defendant he would get him "whatever you want." (Exhibit 3 at 1922). Defendant claimed he was "the businessman" and told Bassem the price he would charge Bassem in Lebanon for guns "depends each on its price." (Exhibit 3 at 1922). As shown by the entirety of Exhibit 3 alone, defendant actively participated in and sought to profit from the gun export scheme. The 53 guns shipped in March 2015 were part of this plan. Because the firearms were part of the same course of conduct involving defendant and Bassem, they would be properly included as well.

Whether defendant is held accountable for 100 or 153 firearms, for the foregoing reasons, an eight-level guideline enhancement is warranted pursuant to USSG § 2K2.1(b)(1)(D).

## II. USSG §2K2.1(b)(6)(A) Enhancement

The PSR finds that an increase in the offense level is warranted pursuant to USSG §2K2.1(b)(6)(A). (PSR ¶ 44). That section provides for a four-level increase:

> If the defendant –
>
> (A) possessed any firearm or ammunition while leaving or attempting to leave the United States, possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States.

Defendant resists application of this enhancement, claiming it should only apply if he personally possessed a firearm that was transferred out of the United States. (Docket 17 at 3).

7

The government acknowledges there is no evidence that defendant personally possessed a firearm that was later transferred or transported out of the United States. However, defendant misconstrues the manner in which the guideline is to be applied.

Defendant accurately notes that some subsections of USSG §2K2.1 contemplate offense level adjustments where "the offense involves" certain conduct, whereas the section at issue references conduct involving "the defendant." (Docket 17 at 3). However, this fact does not compel the interpretation argued by defendant. Rather, the term "defendant" must be read in conjunction with the concepts of "relevant conduct" as found in USSG §1B1.3(a), summarized above.

Pursuant to USSG §1B1.3, defendant is accountable for his own conduct and all conduct "aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." USSG §1B1.3(a)(1)(A); also see USSG §2K2.2, comment. (n.13(B) (noting the term "defendant" is to be read consistent with USSG §1B1.3 (Relevant Conduct)). Defendant is also accountable for acts of others that were part of the same course of conduct or common scheme or plan (USSG §1B1.3(a)(2)), as well as acts of others committed within the scope and in furtherance of the joint criminal activity, and that were reasonably foreseeable in connection with that activity. *See* USSG §1B1.3(a)(1)(B).

Here, as noted above and in the undisputed facts from the PSR, defendant met with Bassem Herz in Lebanon in 2013 and learned Bassem was interested in bringing guns to Lebanon to sell them there. (PSR ¶ 7). Defendant gave Bassem a

8

written list of what guns would sell in Lebanon. *Id.* In 2014, after the first shipment arrived in Lebanon, defendant met with the Herzes and introduced Bilal to them for the purpose of Bilal buying guns shipped to Lebanon by the Herzes. (PSR ¶¶ 12-14). After the guns in the first shipment were sold, and the Herzes returned to the United States, defendant communicated via Facebook from Lebanon with Bassem in the United States, prior to the second shipment, concerning which guns would be preferred for sale in Lebanon. (PSR ¶ 16; Exhibit 3 at 1914-1925). Defendant claimed he got "screwed" on the first gun deal and wanted to work with Bassem on a second gun deal. (PSR ¶ 16; Exhibit 3 at 1913). Indeed, more guns were then shipped to Lebanon and defendant hoped to be involved in the transaction he helped advise on, but claims he was cut out. (PSR ¶ 18). After the second shipment, defendant gave Ali Herz $30,000 cash at the direction of Bilal as an advance to be used to buy more guns in the United States for export to Lebanon. (PSR ¶ 19). Following the sale of the guns in the second shipment, defendant and Bassem continued to communicate with each other on Facebook and through other social media, including secure social media apps. (PSR ¶¶ 21, 23, 25, 27). Bassem told defendant on December 11, 2014, that Bassem was planning to "start working" and that he was "collecting" or ""gathering" (or hoarding) (more guns)." (PSR ¶ 25; Exhibit 3 at 1929). In fact, Bassem and his wife did just that for the next few months. *Id.* In March 2015, near the time when Bassam sent his last shipment of guns to Lebanon, defendant and Bassem again communicated via Facebook in an exchange in which defendant told Bassem he thought Bassem had already arrived

9

in Lebanon. (PSR ¶ 26: Exhibit 3 at 1931, 1934). Based upon the context and timing of this exchange, it appears to investigators that defendant was anticipating Bassem's arrival in Lebanon after sending a shipment of guns to Lebanon. (PSR ¶ 27). Bassem and his wife and child did travel to Lebanon on about March 13, 2015, after loading and shipping the third container destined for Lebanon. (PSR ¶¶ 29, 30).

Based upon the facts summarized above, defendant aided, abetted, and counseled the possession and transfer of guns for shipment to Lebanon from the United States. That conduct was part of a common scheme or plan in which defendant participated. Moreover, the possession of guns in the United States with the knowledge and intent that they would be transported outside the United States was done within the scope and in furtherance of the joint criminal activity, and was reasonably foreseeable to defendant in connection with that activity. For each of these reasons, the adjustment recommended at PSR ¶ 44 is supported by the evidence. *See* USSG §1B1.3(a)(1)(B); *United States v. Asante,* 782 F.3d 639, 646 (11th Cir. 2015) (affirming imposition of §2K2.1(b)(6)(A) enhancement based on defendant's acknowledgement that guns were smuggled out of the United States to Jamaica, thereby providing sufficient evidence defendant knew or reasonably believed guns would be transferred outside of United States); *Vega,* 720 F.3d 1004 (holding §2K2.1(b)(6)(B) enhancement [where "defendant' used or possessed firearm in connection with another felony offense] may be based upon conduct of others that was foreseeable and in furtherance of jointly undertaken criminal activity, as well

10

as to conduct aided and abetted by defendant, though not personally committed by defendant); *United States v. Mendoza,* 556 Fed. Appx. 326, 327 (5th Cir. 2014 (unpublished) (affirming imposition of §2K2.1(b)(6)(A) enhancement based upon the fact the undercover agent told the defendant that firearms being purchased from the defendant were going to Mexico).

### III. Departure / Variance from Advisory Guideline Range Based on Number of Guns Trafficked

Pursuant to an application note to USSG §2K2.1, "If the defendant trafficked substantially more than 25 firearms, an upward departure may be warranted." USSG §2K2.1, comment. (n. 13(C)).

Here, as previously noted, the evidence shows defendant is accountable for trafficking 100–153 firearms. Whether 100, 153, or somewhere in between, defendant was involved trafficking "substantially more than 25 firearms," therefore the departure contemplated in the commentary to USSG §2K2.1 is supported. Defendant knew the Herzes were involved in trafficking guns to and in Lebanon, and knew that activity was illegal. (PSR ¶¶ 12, 35). The guidelines no doubt contemplate an upward departure where a large number of guns have been trafficked because of the enhanced risk to public safety posed by trafficking a large number of guns versus a single gun. The concern is particularly aggravated here, where the guns were exported to an area of the world that is continually in conflict and is controlled by a designated terrorist organization, Hezbollah. Moreover, the

11

guns were being trafficked to Bilal, a known member of Hezbollah, and large scale gun dealer.

## IV. Downward Departure / Variance from Advisory Guideline Range

Defendant has indicated he will seek a downward departure or variance. The facts outlined in the PSR show defendant was engaged in very serious conduct. There is nothing extraordinary about this case other than the aggravating nature of the conduct. Therefore, the United States will resist any motion for downward departure or variance.

The government respectfully requests a further opportunity to respond directly to any motion filed by defendant.

## V. Conclusion

Wherefore, the United States respectfully requests the Court impose a sentence in this case that takes into account the matters discussed above, the applicable sentencing guidelines, and the factors contained in 18 U.S.C. § 3553(a).

Respectfully submitted,

SEAN R. BERRY
Acting United States Attorney

By, *Richard L. Murphy*

RICHARD L. MURPHY
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401
319-363-6333/319-363-1990 (Fax)
Rich.Murphy@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2017, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: /s/lsm

cc: Angela Campbell